James M. HENNESSEY, Linn County Treasurer, Appellee,

v.

CEDAR RAPIDS COMMUNITY SCHOOL DISTRICT, Marion Independent School District, College Community School and Linn-Mar Community School District, Appellants,

City of Cedar Rapids, Iowa, Intervenor-Appellant.

No. 84–1673.

Supreme Court of Iowa.

Oct. 16, 1985.

Ronald W. Wendt of Nazette, Hendrickson, Marner & Good, Cedar Rapids, for appellants Cedar Rapids Community School Dist., Marion Independent School Dist., College Community School and Linn-Mar Community School Dist.

Andrew Matthews, Asst. City Atty., for intervenor-appellant City of Cedar Rapids.

Craig Kelinson, Asst. Linn Co. Atty., for appellee James M. Hennessey.

Thomas J. Miller, Atty. Gen., and Theresa O'Connell Weeg, Asst. Atty. Gen., for amicus curiae state auditor.

Lee H. Gaudineer of Austin & Gaudineer, Des Moines, for amicus curiae Iowa State Ass'n of Counties.

Considered by HARRIS, P.J., and McCORMICK, LARSON, CARTER and WOLLE, JJ.

LARSON, Justice

James M. Hennessey, Treasurer of Linn County, and four of the local school districts disagreed about the interpretation of Iowa Code section 298.13, which requires a treasurer to distribute tax funds to school districts by the fifteenth of the month following their collection by the treasurer. Hennessey contended that tax payments received, but not processed, before the end of the month had not been "collected" within the meaning of the statute. The school districts interpreted section 298.13, however, to require distribution of all tax receipts received during the prior month, regardless of when they were processed.

The treasurer filed this declaratory judgment action to resolve the issue. The school districts counterclaimed against the treasurer for a writ of mandamus to compel payment of the tax proceeds in accordance with the districts' interpretation of section 298.13. The City of Cedar Rapids, which is covered by a similar statute, Iowa Code section 384.11, intervened on the side of the school districts. For our purposes, we will merely refer to the defendants collectively as the school districts.

The district court agreed with the treasurer's interpretation of the section: Tax payments received but not processed before the end of the month were not "collected" within the meaning of the statute. The school districts and the city appealed. On the appeal, the state auditor and the Iowa State Association of Counties participated as amici curiae to argue for Hennessey's interpretation. We affirm.

The statute relating to tax distribution to school districts provides:

Before the fifteenth day of each month, the county treasurer shall send the amount collected for each fund through the last day of the preceding month for direct deposit into the depository and account designated by the school board. The county treasurer shall send a notice to the secretary of the school board stating the amount deposited, the date, the amount to be credited to each fund according to the budget, and the source of revenue.

Iowa Code § 298.13.

The statute relating to distribution of tax money to cities is found in Iowa Code section 384.11. This section is identical to section 298.13, except it refers to the city, rather than the school board, and to the city clerk rather than the secretary of the school board.

Hennessey testified about the property tax procedures in his office and the practical problems in adopting the defendants' interpretation of section 298.13. His office accepts tax statements in three ways: by walk-in payment, by mail, and by direct deposit to the county's account, by the taxpayers, in local banks.

After payment (or in the case of a direct deposit, a copy of the deposit slip) is received by the treasurer's office, several steps are required. The tax status of the real estate is checked to see if there are any delinquent taxes. If there are, these must be paid first. In that case, any checks tendered in a different amount, or for a different tax period, must be returned. If the taxes are not delinquent, and the tendered payment is in proper form and in the proper amount, the treasurer marks one copy of the billing "paid" and returns it to the taxpayer as a receipt. The second copy is retained as a permanent record. A permanent record of the payment is also made by a validating process in which, at various times during the day, the tax district, parcel number, and payment amount information are fed to a computer. That information is stored, and, during the night, the computer generates a validation sticker to be attached to the tax

list. This "certified tax list" in the treasurer's office, which consists of the tax list with the validation stickers attached, is considered to be the official tax record.

The treasurer considers these steps as a "three-part" process: the actual receipt of the payment, issuance of the receipt, and the validation. While these processes sound fairly complicated, at most times of the year they can be handled immediately. Because of the propensity of taxpayers to delay payment as long as possible, however, property tax receipts come in flood proportions at the March 30 and September 30 deadlines (Iowa Code section 445.37 (1985) imposes a penalty on taxes not paid by these dates.).

At peak times, 1200 to 1500 payments are refused because of some irregularity or delinquency in the taxes. This means a return of individual checks or any other payment tendered. Also, at these times, four to six post office sacks of mail are received on a daily basis, and Hennessey testified it is not possible for his staff to process the mail as fast as it comes in. Moreover, walk-in traffic is given priority at these peak times, further delaying the processing of accumulated mail. Payments by loan companies from escrow accounts on behalf of their mortgagors also provide additional work at this time. Hennessey cited an example of just one loan company which paid property taxes for approximately 2500 borrowers. These escrow payments, which are made on or near the deadline, must be processed individually and separate receipts issued for each of them.

In the case of a direct deposit to a local bank, the taxpayer takes the tax bill to the bank and makes the payment. The bank credits the treasurer's account. A copy of the deposit slip, with copies of the tax bill, are forwarded to the treasurer, usually by mail. The treasurer verifies the amount of the deposit with the amount of the taxes owed and checks for delinquent taxes. If the taxes are current, and the amount tendered is correct, the treasurer prepares a receipt, and validation occurs as in the case

of direct payments. Because the banks do not always forward the deposit slips immediately, and because of the mailing time, the treasurer usually receives them several days after the taxes are actually paid to the bank. After the tax documents are received by the treasurer, they must still be processed as previously described. That could result in a delay of several more days.

Hennessey testified that, in order to apportion tax receipts as required by section 298.13, he must know the total amount available for distribution as of that time. That may be determined only by calculating the total receipts processed through his office as of that date. At peak times, with so many payments still being processed, he cannot make that determination without adopting a cutoff date.

The school districts argue that, even so, a determination of the amount available for distribution as of the last day of the preceding month could be made at a later time, presumably within the first few days of the following month. According to them, this would still be early enough to make a distribution by the fifteenth of the month. Hennessey disagrees. Payments received at the March and September deadlines are usually not fully processed until about the twentieth of the following months, according to his testimony.

Hennessey has resolved the problem of apportionment of the peak months' proceeds by closing his books as of the end of each month and showing only those payments fully processed as of that time as actually "collected" by him. Testimony showed that most other county auditors follow the same practice.

The State Auditor's Office agrees with Hennessey. We believe the auditor's interpretation is entitled to considerable weight because of the broad responsibility vested in the auditor's office in the area of tax collection practices. For example, Iowa Code section 445.5 provides that the state auditor shall approve the "books or other records" for the treasurers' use. Iowa Code section 11.6 requires the auditor's

office to examine "[t]he financial condition and transactions of all counties" once each year. Iowa Code section 11.11 provides for the auditor's examination of counties and other subdivisions of government and a determination of "whether the county, school or city authorities are complying with the law; and whether the accounts and reports are being accurately kept."

 Warren Jenkins, deputy auditor in charge of local government audits, testified the practice of Hennessey, and the other treasurers, was in compliance with the law and with accepted accounting principles. He stated that

> [t]he position of our office is that the date that the tax payment is recorded as collected, at the time it's entered into the county treasurer's records is the time that determines when the apportionment will take place for that particular collection.

He also testified there was no inconsistency in considering taxes to be "paid" when received, for purposes of the penalty statute, but not necessarily "collected" at that time for purposes of apportionment.

When an agency or state officer is charged with the responsibility of implementing a statute and has interpreted a statute in a particular way, that interpretation is entitled to considerable weight, especially if it is of long standing, without legislative intervention. *See* Iowa Code § 4.6(6); *Saydel Education Association v. Public Employment Relations Board,* 333 N.W.2d 486, 489 (Iowa 1983); *Churchill Truck Lines, Inc. v. Transportation Regulation Board,* 274 N.W.2d 295, 298–99 (Iowa 1979); 2A Sutherland, *Statutory Construction* § 49.05, at 362–63 (Sands 4th ed.1984). That is the situation in this case. We believe an official interpretation of the statute by an officer, such as the state auditor, should be given weight at least comparable to that given to state agencies.

In this case, there are strong arguments to support the interpretation urged by the school districts, particularly their argument that, in most situations, "collect-

ed" and "received" could be considered to be synonymous. On the other hand, there is merit in the argument that "collected" is a word of art with a special meaning in these circumstances. The practice followed by Hennessey is consistent with the latter interpretation and is supported by the state auditor's reading of the statutes in question. Under these circumstances, we believe Hennessey's interpretation of the statute is correct.

The district court properly entered judgment for Hennessey on his declaratory judgment action and on the counterclaim for a writ of mandamus.

AFFIRMED.